UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| **MARSELLES JEFFERSON** <br><br> Plaintiff, <br><br> v. <br><br> **SCIENCE APPLICATIONS INTERNATIONAL CORP., JEFFREY BURDETT, MATTHEW JAMISON, and ALLEN C. JOHNSON** <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | CASE NO. _____ |

# COMPLAINT

1. Plaintiff Marselles Jefferson ("Jefferson" or "Plaintiff"), by and through undersigned counsel, states the following complaint against Science Applications International Corp. ("SAIC") for equitable relief and damages.

## NATURE OF THE CLAIMS

2. The importance of protecting and safeguarding federal computer systems from hacking or other intrusions cannot be overstated. This case concerns a whistleblower who sought to protect the computer systems at a strategic military base located in Germany that the U.S. Air Force and NATO use to train military personnel. When Marselles Jefferson tried to do his job and then exposed the failure of SAIC and others to ensure the protection of the U.S. Department of

1

Defense's (DOD's) information systems he faced harassment and retaliation in violation of federal laws protecting whistleblowers.  His unlawful termination caused significant injury and economic losses for Jefferson and his family.

## PARTIES

3. **Plaintiff** Marselles Jefferson is a United States citizen and resident of the State of Texas.

4. **Defendant** Science Applications International Corp. is a publicly traded company that has described itself as "a premier Fortune 500 technology integrator driving our nation's digital transformation. Our robust portfolio of offerings across the defense, space, civilian, and intelligence markets includes secure high-end solutions in engineering, IT modernization, and mission solutions. Using our expertise and understanding of existing and emerging technologies, we integrate the best components from our own portfolio and our partner ecosystem to deliver innovative, effective, and efficient solutions that are critical to achieving our customers' missions. We are 25,500 strong; driven by mission, united by purpose, and inspired by opportunities. Headquartered in Reston, Virginia, SAIC has pro forma annual revenues of approximately $7.1 billion."[1] SAIC maintains offices and conducts business in the District of Columbia.

5. **Individual Defendants** Jeffrey Burdett, Matthew Jamison, and Allen C. Johnson were employed by SAIC at all times relevant to events raised in this Complaint.  Each of the Individual Defendants supervised or had authority over Jefferson.  Each of the Individual

---

[1] *See*, SAIC News Release, dated October 29, 2020.  Available at https://investors.saic.com/press-releases/press-release-details/2020/SAIC-Wins-737-Million-Ceiling-U.S.-Air-Force-Modeling-and-Simulation-Support-Services-Contract/default.aspx (last viewed June 7, 2024).

Defendants was involved in initiating, participating in, or authorizing actions that harassed or retaliated against Jefferson when he engaged in activities protected by federal law, including placing Jefferson on leave without pay (LWOP) and terminating his employment.

## JURISDICTION AND VENUE

6. This Court has jurisdiction over the subject matter of this action because the claims asserted in it arise out of the laws of the United States. 28 U.S.C. § 1331.  As is more fully described below, this action asserts claims that the rights of Plaintiff under federal whistleblower protection laws were violated when Defendant harassed and terminated him.

7. This Court also has jurisdiction under the Sarbanes-Oxley Act, 18 U.S.C. §1514A(b)(1)(B) (SOX). Jefferson filed a complaint with the U.S. Department of Labor, but that agency was unable to render a final decision within 180 days. Jefferson's administrative remedies under SOX are exhausted.

8. This Court has jurisdiction under 10 U.S.C. § 4701, which protects defense contractor employee whistleblowers.  Jefferson filed a complaint with the U.S. Department of Defense, Office of Inspector General but that agency failed to render a final decision within 210 days. Jefferson's administrative remedies under § 4701 are exhausted.

9. Finally, this Court has jurisdiction under the employee protection provision of the federal False Claims Act, 31 U.S.C. § 3730(h).

10. Venue is proper in this district under 28 U.S.C. §1391(b)(1).

## OVERVIEW OF STATUTORY AND REGULATORY FRAMEWORK

11. Federal military and civilian agency computer systems are subject to testing, scans, and other oversight activities designed to minimize the risk of hacking and loss or access by unauthorized persons to sensitive and secret information.

12. During his tenure as a cyber security professional with SAIC, Jefferson sought to ensure that SAIC and the federal government computer systems it was tasked with supporting complied with various federal information system security requirements.

13. The Federal Information Security Modernization Act ("FISMA") provides a statutory mandate for the "development and maintenance of minimum controls required to protect Federal information and information systems." 44 U.S.C. § 3551(3).

14. Together with the security requirements established under FISMA, the Department of Defense Chief Information Officer ("CIO") and the CIOs of the military departments must "ensure that information technology and national security systems are in compliance with standards of the Government and the Department of Defense." 10 U.S.C. § 2223.

15. The Secretary of Defense must establish a Defense Information Assurance Program. A key element of that program is "vulnerability and threat assessment of elements of the defense and supporting nondefense information infrastructures that are essential to the operations of the Department and the armed forces." 10 U.S.C. § 2224(c)(1).

16. Federal law makes it a crime to intentionally access a government computer or computer system without authorization or to exceed authorized access to a government computer or computer system. 18 U.S.C. § 1030.

17. The National Institute of Standards and Technology ("NIST") is a bureau of the Department of Commerce. NIST develops standards and guidance for federal information systems that become mandatory under FISMA once approved by the Office of Management and Budget ("OMB"). 15 U.S.C. § 278g-3.

18. Under Executive Order 13800, NIST publications are the authoritative guidelines for the DOD's Risk Management Framework.  DOD Instruction 8510.01, "Risk Management Framework for DOD Systems."

19. NIST publishes various standards intended to implement FISMA requirements and that apply to DOD facilities, including NIST Special Publication 800-53 ("NIST 800-53") entitled "Security and Privacy Controls for Information Systems and Organizations" and NIST Special Publication 800-53A ("NIST 800-53A") entitled "Assessing Security and Privacy Controls in Information Systems and Organizations."

20. NIST also develops Federal Information Processing Standards ("FIPS").  FIPS are published when required by statute or when there are compelling federal government requirements for cyber security.

21. FIPS 200, "Minimum Security Requirements for Federal Information and Information Systems" is the standard that addresses minimum security requirements for federal information and information systems.

22. From the standards mentioned above, the Air Force develops and issues Air Force Instructions or Task Orders ("TASKORD") to carry out specific activities intended to ensure cyber security requirements are met.

## FACTS

23. Marselles Jefferson is a cyber security professional with over fifteen years of experience working with United States defense contractors and supporting their information technology systems.  Much of his experience has involved international projects.

24. Jefferson holds a master's degree in management information systems.

25. Among his many trainings and certifications, Jefferson is a Certified Information Security Manager (CISM); a certified CompTIA Security+ Professional; Microsoft Certified Professional and System Administrator; certified in Applying Assessment and Authorization (A&A) in the National Industrial Security Program (NISP); certified completion of training in Technical Implementation Assessment and Authorization (A&A) in the National Industrial Security Program (NISP); and a certified completion of training in Cyberprotect from the Defense Counterintelligence Security Agency Center for Development of Security Excellence (DCSA CDSE).

26. Much of Jefferson's expertise focuses on vulnerability management, compliance, and policy development using the Risk Management Framework ("RMF") and Security and Privacy Controls for Information Systems and Organizations **("NIST SP 800-53")** compliance framework.

27. In September 2019, Jefferson began working at the Headquarters USAFE-AFAFRICA Warfare Center ("UAWC"), at Einsiedlerhof Air Station, Germany as a Cyber Security Systems Administrator for U.S. Air Force contractor Huntington Ingalls Industries.

28. The U.S. Air Force ("USAF") describes the UAWC as "a multi-faceted organization dedicated to enhancing warfighter readiness across the European and African theaters. It is comprised of seven squadrons with distinct missions supported by two divisions. Under the Center's direction, they host joint multinational exercises, deliver an array of education and training courses to U.S. forces, allies and partners, and deliver decision-quality data and analysis to the Commander, USAFE-AFAFRICA as a subordinate unit to USAFE-AFAFRICA Director of Operations, Strategic Deterrence and Nuclear Integration."

29. On or about October 2020, SAIC "won the U.S. Air Force Modeling and Simulation Support Services (AFMS3) 2.0 contract to implement, integrate, and develop modeling and simulation (M&S), training, and analysis standards for the Air Force, Department of Defense, and other organizations. Released by General Service Administration (GSA) FEDSIM on the GSA OASIS contract vehicle, the total potential value of the single-award contract has a ceiling of $737 million."[2]

30. In December 2020, Jefferson transitioned to SAIC, which had taken over the contract from Huntington Ingalls Industries.

31. Jefferson's primary duties for SAIC were to scan UAWC's Information Technology ("IT") systems and networks that were assigned to him for vulnerabilities and address any required remediation, validate security control implementation, and perform compliance audits before presenting those results to the Authorizing Official for certification to connect to the Department of Defense ("DOD") network.

32. In or around January 2021, Jefferson disclosed to SAIC Program Director, Matthew Jamison that he noticed deficiencies in the company's internal security control reporting. He also disclosed that the company was using incorrect metrics for reporting material information about cybersecurity risk management, strategy, and governance to stockholders and the U.S. Securities and Exchange Commission ("SEC").

33. In or around November 2021, Jefferson sent multiple emails detailing critical Assured Compliance Assessment Solution **("ACAS")** issues and vulnerabilities in the IT system to Ray Freeman (Senior Systems Engineer, USAFE WPC/SCOO) and he copied Jamison and other management personnel.

---

[2] *See,* News Release referenced in note 1.

34. ACAS is an internal vulnerability management continuous monitoring security program used to assess DOD networks and connected IT systems developed by the Defense Information Systems Agency ("DISA"). DISA is a DOD combat support agency.

35. ACAS provides both active and passive threat scanning capabilities and meets DISA's Security Technical Implementation Guidelines ("STIGs").

36. Proper implementation of ACAS is mandated for computer networks and components that are owned or operated by the DOD. The computer networks and components that Jefferson worked on were owned and operated by the U.S. Air Force and DOD.

37. In or around early December 2021, Jefferson sent emails informing USAF Master Sergeant ("MSgt") Samuel Clem, Technical Sergeants ("TSgt") Daniel Miller and Jeffrey Fujita, and SAIC management about the ACAS scan issues because the issues he detected could create problems in the vulnerability management process.

38. Still concerned about persistent security issues, in or around mid-December 2021, Jefferson informed SAIC Deputy Program Manager Johnson, Program Manager Jamison, and other SAIC management personnel about SAIC employees not following government regulations concerning SAIC's internal IT security controls. He also reported to SAIC management, that SAIC employees were reporting to the United States Government that SAIC was compliant and maintained appropriate internal security controls when the company did not.

39. In or around February 2022, Jefferson emailed Johnson stating that SAIC was out of compliance concerning the configuration of ACAS permissions on its networks.

40. In or around March 2022, Jefferson notified USAF Security Manager Reuben Gjellstad that it was a conflict of interest for him to serve as the approving official for security and

accreditation because he had once been a member of the U.S. military and was previously employed by SAIC in a similar capacity.

41. In response, Gjellstad threatened Jefferson that he would remove his telework authorization and his duties performing vulnerability scans on the networks.

42. Jefferson reported Gjellstad's threat to USAF Director of Communications Jonathan Powell and other management personnel.

43. In April 2022, Jefferson participated in a management meeting with Director Powell, Jamison, and other management personnel. During this meeting, Jefferson told the managers that Gjellstad had made disparaging comments about him to his peers and explained that SAIC and Gjellstad were making improper changes to policies, the AFMS3 contract, and committing fraud, waste, and abuse.

44. Some of Jefferson's concerns were related to unnecessary equipment purchases and the modifications that were being made to the Request for Services ("RFS") on AFMS3 Option Year 2 (OY2). Jefferson continued to describe the fraudulent action and infractions against Air Force/DOD policy, and his unwillingness to take part.

45. Jefferson was informed that his objections or concerns were detrimental to the program and that the SAIC would continue as usual, despite the many concerns he brought forward. Jamison asked whether Jefferson would "play ball" and be a "team player" regarding the issues he raised.

46. On April 8, 2022, Jefferson sent a follow-up email to Powell, Jamison, and other management personnel stating that he disagreed with their decision not to take action regarding his concerns.

47. Jamison demanded that Jefferson recall the email. Jamison also threatened Jefferson asking, "Do you still want to work here?"

48. In around mid-April 2022, Johnson spoke to Jefferson about customer interactions detailing SAIC's expectations. Johnson also suspended Jefferson's telework privileges and advised him that he must provide additional doctors' notes to verify that he was caring for a disabled spouse and small child. Jefferson promptly provided another doctor's note.

49. In late April 2022, Johnson and Jamison removed Jefferson from his role as Cyber Security Lead and demoted him. Jefferson was removed because of his disclosers about cyber security lapses and non-compliance with security standards.

50. As part of the retaliation against him, Jefferson was also forced to take family and medical leave rather than telework.

51. In mid-June, Jefferson returned from forced leave. He was initially approved to telework but within a few days, Jefferson's telework authorization was again denied. Despite others at UWAC continuing to telework, he was no longer permitted to do so.

52. Jefferson continued to do his job by flagging that best practices were not being followed and by raising concerns about certain vulnerabilities in the UAWC's systems/networks.

53. Jefferson's work environment became more hostile. He learned that his work was being discredited among other members of the cyber security team. Members of the team would only engage in verbal discussions about the issues he raised and would not address them in writing.

54. Without warning or explanation, Jefferson's ACAS access was removed, and he was unable to get responses to his trouble tickets.

55. In late June 2022, without his consent, Jefferson's passwords were changed, preventing him from accessing the system. Then Jefferson's SAIC managers began harassing him about

deliverables even though he was meeting his primary work obligations despite the harassment and hostility he was experiencing.

56. In early July 2022, Jefferson complained about the treatment he was experiencing to SAIC Program Director Jeffrey Burdett, Human Resources Director Stacey Wyland, and other management personnel. Jefferson explained that he was being retaliated against for raising concerns about cybersecurity deficiencies and related issues.

57. In about mid-July, Jefferson was removed from the AFMS3 2.0 Contract and placed on leave without pay ("LWOP") status effective for the next four weeks.

58. On August 5, 2022, Jefferson notified SAIC Executive, Human Resources, and Management Personnel, including then-CEO Nazzic Keene, that they were committing fraud against the U.S. Government by making false claims, submitting improper security controls, and providing false information that created risks to national security. Jefferson's message stated, in part, that SAIC officials "knowingly submitting insufficient security controls to the government . . . [committing fraud] that cost taxpayers billions of dollars annually and it puts our national security at risk." He also stated that SAIC officials had "consistently lied to the government."

59. On August 29, 2022, Johnson informed Jefferson that he was terminated.

60. From January 2021 to the end of his employment, Jefferson expressed his concerns about several violations occurring and accruing at SAIC. Jefferson reported to USAF and SAIC managers that SAIC had failed to disclose its materially weak computer system security controls including its substandard policies and procedures relating to the prevention and timely detection of unauthorized acquisitions, use, or disposition of SAIC's assets.

61. SAIC also failed to report to the USAF or DOD its status on all required controls, made misstatements about its partial compliance, and cherry-picked some of the data it shared with the

government. In doing so, SAIC put government information systems at risk by knowingly providing deficient cyber security services and misrepresenting their cyber security practices. SAIC and subcontractors knew its computer systems failed to meet FISMA, TASKORD 2020-0020, NOTAM 2020-307-005, Risk Management Framework requirements, and NIST 800-53 cyber security requirements. SAIC received its Option Year (OY) contract award based on misleading statements by not fully disclosing the extent of its non-compliance.

62. Failure to maintain adequate cybersecurity controls and the misreporting of efficiency and performance metrics constitute a betrayal of SAIC's obligation to its shareholders.

63. In seeking payment from the government while failing to provide the required cybersecurity for government computer systems, SAIC deliberately submitted false claims to the government via the mail system and by wire communications such as the internet. In making the disclosures that led to his termination, Jefferson sought to ensure that the government's computer systems were protected and prevent SAIC from making false claims or representations to the government.

## **COUNT ONE (Violation of 10 U.S.C. § 4701)**
## **Against SAIC**

64. Jefferson incorporates and restates the proceeding paragraphs.

65. Jefferson made disclosures protected by 10 U.S.C. § 4701 when he reported to SAIC managers and USAF personnel (as more fully described above) that there were deficiencies or lapses in cybersecurity protocols and protections being implemented at UAWC. Jefferson's disclosures as described herein were a contributing factor in the adverse actions taken against him. The adverse actions taken against Jefferson materially affected the terms, privileges, and conditions of Jefferson's employment, resulting in his termination and loss of repatriation benefits among other damages.

66. At all times relevant to the claims set forth, SAIC was aware of Jefferson's protected disclosures.

67. The reasons proffered by SAIC for its unlawful conduct are pretextual and the company cannot offer any further legitimate, nondiscriminatory reason for its unlawful conduct.

68. As a direct and proximate cause of SAIC's unlawful and retaliatory conduct, Jefferson has suffered and continues to suffer from harm, injury and monetary damages—including but not limited to past and future loss of income, benefits, promotion and promotional opportunities, career opportunities, medical expenses, and costs—and is entitled to all available legal and equitable remedies.

69. Jefferson was humiliated, embarrassed, and made to endure a great amount of pain and suffering, and his injury is permanent.

70. Jefferson has incurred lost wages, loss of reputation, and loss of career opportunities now and into the future, and all the other losses stated herein, without fault on his part.

## COUNT TWO (Violation of 31 U.S.C. § 3730(h))

## Against SAIC

71. Jefferson incorporates and restates the proceeding paragraphs.

72. Jefferson made disclosures protected by 31 U.S.C. § 3730(h) when he reported to SAIC managers and USAF personnel (as more fully described above) that there were deficiencies or lapses in cybersecurity protocols and protections being implemented at UAWC and that SAIC was making false claims and representations about ensuring and complying with cyber security standards.

73. In making his disclosures, Jefferson sought to stop or prevent false representations and claims from being presented to the government.

74. Jefferson's disclosures as described herein were a cause of the adverse actions taken against him. The adverse actions taken against Jefferson materially affected the terms, privileges, and conditions of Jefferson's employment, resulting in his termination and loss of repatriation benefits among other damages.

75. At all times relevant to the claims set forth, SAIC was aware of Jefferson's protected disclosures.

76. The reasons proffered by SAIC for its unlawful conduct are pretextual and the company cannot offer any further legitimate, nondiscriminatory reason for its unlawful conduct.

77. As a direct and proximate cause of SAIC's unlawful and retaliatory conduct, Jefferson has suffered and continues to suffer from harm, injury and monetary damages—including but not limited to past and future loss of income, benefits, promotion and promotional opportunities, career opportunities, medical expenses, and costs—and is entitled to all available legal and equitable remedies.

78. Jefferson was humiliated, embarrassed, and made to endure a great amount of pain and suffering, and his injury is permanent.

79. Jefferson has incurred lost wages, loss of reputation, and loss of career opportunities now and into the future, and all the other losses stated herein, without fault on his part.

### COUNT THREE (Violation of 18 U.S.C. § 1514A)

### Against All Defendants

80. Jefferson incorporates and restates the proceeding paragraphs.

81. Jefferson made disclosures protected by 18 U.S.C. § 1514A when he reported to SAIC managers and USAF personnel (as more fully described above) that there were deficiencies or lapses in cyber security protocols and protections being implemented at UAWC and that SAIC

was making false claims and representations about ensuring and complying with cyber security standards.

82. In making his disclosures, Jefferson was asserting that SAIC was committing mail fraud and/or wire fraud, which he had tried to prevent. SAIC failed to accurately report to investors, shareholders, or the U.S. Securities and Exchange Commission ("SEC") that in its work as a government defense contractor, it had failed to meet and was falsely reporting compliance with cyber security standards and requirements.

83. Jefferson's disclosures as described herein were a cause of the adverse actions taken against him by the Individual Defendants, and those adverse actions were endorsed by SAIC. The adverse actions taken against Jefferson materially affected the terms, privileges, and conditions of Jefferson's employment, resulting in his termination and loss of repatriation benefits among other damages.

84. At all times relevant to the claims set forth, SAIC and the Individual Defendants were aware of Jefferson's protected disclosures.

85. The reasons proffered by SAIC and the Individual Defendants for their unlawful conduct are pretextual and they cannot offer any further legitimate, nondiscriminatory reasons for their unlawful conduct.

86. As a direct and proximate cause of Defendants' unlawful and retaliatory conduct, Jefferson has suffered and continues to suffer from harm, injury and monetary damages—including but not limited to past and future loss of income, benefits, promotion and promotional opportunities, career opportunities, medical expenses, and costs—and is entitled to all available legal and equitable remedies.

87. Jefferson was humiliated, embarrassed, and made to endure a great amount of pain and

suffering, and his injury is permanent.

88. Jefferson has incurred lost wages, loss of reputation, and loss of career opportunities now and into the future, and all the other losses stated herein, without fault on his part.

## JURY DEMAND

89. Trial by jury for all issues so triable is demanded.

## RELIEF REQUESTED

90. For the reasons outlined above, Jefferson seeks make-whole equitable relief and damages and asks the Court to enter judgment in his favor and against the Defendants jointly and severally

(a) Declaring Defendant's actions unlawful;

(b) Granting equitable and/or injunctive relief to Jefferson, including immediate reinstatement to his position or an equivalent position or, instead of reinstatement, front pay;

(c) Awarding compensatory damages, including emotional distress;

(d) Awarding back pay, lost wages and benefits, including costs of repatriation;

(e) Awarding Jefferson compensation for special damages under 18 U.S.C. 1514A, including litigation costs, expert witness fees, and reasonable attorney fees;

(f) Awarding Jefferson reasonable attorneys' fees, costs, and expenses;

(g) Awarding Jefferson pre- and post-judgment interest at the maximum rate permitted by law; and

(h) All such other relief as the Court or jury deems just and appropriate.


///

///

///

| | |
|---|---|
| Date: June 11, 2024 | Respectfully submitted, |

/s/ Richard E. Condit

_____
Richard E. Condit (Bar # 417786)
Cleveland Lawrence III (Bar # 480462)
Oluwadamilola Animashaun (Bar # 1782051)
MEHRI & SKALET PLLC
2000 K Street, NW, Suite 325
Washington, DC 20006
Tel 202.822.5100
rcondit@findjustice.com
clawrence@findjustiuce.com
oanimashaun@findjustice.com

*Counsel for Marselles Jefferson*