**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

MARSELLES JEFFERSON,

           *Plaintiff*,

    v.

SCIENCE APPLICATIONS
INTERNATIONAL CORP., *et al*,

           *Defendants*.

Civil Action No. 24-1692 (SLS)

Judge Sparkle L. Sooknanan

## <u>MEMORANDUM OPINION</u>

Marselles Jefferson was employed as a cyber security professional at the Science Applications International Corporation (SAIC) in Germany. SAIC has a federal contract through the General Services Administration (GSA) to perform services for the United States Air Force. SAIC fired Mr. Jefferson after he raised concerns about fraud and lapses in protocol that he observed at SAIC. He sued to challenge his termination under three federal statutes that protect whistleblowers: the National Defense Authorization Act, the False Claims Act, and the Sarbanes-Oxley Act. The Defendants have moved to dismiss the False Claims Act and Sarbanes-Oxley Act claims under Federal Rule of Civil Procedure 12(b)(6). For the reasons below, the Court denies the motion in part and grants it in part.

## BACKGROUND

The Court draws the facts, accepted as true, from the Plaintiff's Complaint. *Wright v. Eugene & Agnes E. Meyer Found.*, 68 F. 4th 612, 619 (D.C. Cir. 2023).

Marselles Jefferson is an American citizen with fifteen years of experience working as a cyber security professional for United States defense contractors. *See* Compl. ¶¶ 3, 23, ECF No. 1.

He holds several certifications. *Id.* ¶ 25. In September 2019, Mr. Jefferson "began working at the Headquarters USAFE-AFAFRICA Warfare Center (UAWC), at Einsiedlerhof Air Station, Germany as a Cyber Security Systems Administrator for the U.S. Air Force contractor Huntington Ingalls Industries." *Id.* ¶ 27. In October 2020, SAIC, a publicly traded U.S. company headquartered in Virginia, won a U.S. Air Force contract valued at $737 million from GSA "to implement, integrate, and develop modeling and simulation[,] training, and analysis standards for the Air Force, Department of Defense, and other organizations." *Id.* ¶¶ 4, 29. Two months later, Mr. Jefferson "transitioned to SAIC," *id.* ¶ 30, where his primary duties included "scan[ning] UAWC's Information Technology systems and networks that were assigned to him for vulnerabilities and address[ing] any required remediation, validat[ing] security control implementations, and perform[ing] compliance suits before presenting those results to the Authorizing Official for certification to connect to the Department of Defense network," *id.* ¶ 31.

Around January 2021, Mr. Jefferson "disclosed" to Matthew Jamison, SAIC's Program Manager, that he spotted "deficiencies" in SAIC's internal security control reporting. *Id.* ¶ 32. He reported that the company was "using incorrect metrics" to report "material information" about "cybersecurity risk management, strategy, and governance" to the U.S. Securities and Exchange Commission and stockholders. *Id.* Around November 2021, Mr. Jefferson "sent multiple emails detailing critical . . . issues and vulnerabilities in the IT system" to a senior engineer, copying Mr. Jamison and other SAIC management. *Id.* ¶ 33. Around December 2021, "[s]till concerned about persistent security issues," Mr. Jefferson informed SAIC management personnel that its "employees [were] not following government regulations" regarding the company's IT security controls. *Id.* ¶¶ 37–38. At the same time, he also notified SAIC management that its "employees were reporting to the United States Government that SAIC . . . maintained appropriate internal

security controls when the company did not." *Id.* In February 2022, Mr. Jefferson emailed SAIC Program Manager Johnson to report that "SAIC was out of compliance" with the configuration of an internal vulnerability management monitoring system on its networks. *Id.* ¶ 39.

In April 2022, while participating in a management meeting with U.S. Air Force personnel, Mr. Jamison, and other SAIC management personnel, Mr. Jefferson explained that SAIC was "making improper changes to policies . . . and committing fraud, waste, and abuse." *Id.* ¶ 43. His concerns related to "unnecessary equipment purchases" and "modifications that were made to the Request for Services," as well as Mr. Jefferson's "unwillingness to take part" in "fraudulent action and infractions against Air Force/DOD policy." *Id.* ¶ 44. Mr. Jefferson "was informed that his objections [and] concerns were detrimental to the program," and Mr. Jamison questioned whether Mr. Jefferson would "play ball" and be a "team player" about the issues he brought forward. *Id.* ¶ 45. Refusing to back down, on April 8, 2022, Mr. Jefferson sent an email to SAIC management personnel stating that "he disagreed with their decision not to take action regarding his concerns." *Id.* ¶ 46. Mr. Jamison demanded Mr. Jefferson "recall the email," and he "threatened" Mr. Jefferson by asking, "Do you still want to work here?" *Id.* ¶ 47.

Around mid-April 2022, Mr. Johnson, a SAIC Deputy Program Manager, "suspended [Mr.] Jefferson's telework privileges." *Id.* ¶ 48. Mr. Jefferson was also forced to take family and medical leave rather than telework. *Id.* ¶ 50. In late April, Mr. Jamison and Mr. Johnson demoted Mr. Jefferson, removing him as "Cyber Security Lead." *Id.* ¶ 49. According to Mr. Jefferson, he was removed because of "his disclosures about cyber security lapses and non-compliance with security standards." *Id.*

In mid-June, after Mr. Jefferson returned from forced leave, his "work environment became more hostile." *Id.* ¶¶ 51–53. Mr. Jefferson's work was "discredited among other members of the

cyber security team," and members would "only engage in verbal discussions about the issues he raised and . . . not address them in writing." *Id.* ¶ 53. Soon after, Mr. Jefferson's access to the internal vulnerability management security program was removed and his "passwords were changed, preventing him from accessing the system." *Id.* ¶ 54.

In early July 2022, Mr. Jefferson complained to "SAIC Program Director Jeffrey Burdett, Human Resources Director Stacey Wyland, and other management personnel" that "he was being retaliated against for raising concerns about cybersecurity deficiencies and related issues." *Id.* ¶ 56. In mid-July, Mr. Jefferson was placed on leave without pay for four weeks. *Id.* ¶ 57. On August 5, 2022, Mr. Jefferson "notified SAIC Executive, Human Resources, and management Personnel, including then-CEO Nazzic Keene, that they were committing fraud against the U.S. Government by making false claims, submitting improper security controls, and providing false information that created risks to national security." *Id.* ¶ 58. Mr. Jefferson stated that SAIC officials "knowingly submitt[ed] insufficient security controls to the government and [committed fraud] that cost taxpayers billions of dollars annually and . . . put[] our national security at risk." *Id.* ¶ 58 (cleaned up). "He also stated that SAIC officials 'had consistently lied to the government.'" *Id.* ¶ 58. A little over three weeks later, on August 29, 2022, SAIC terminated Mr. Jefferson. *Id.* ¶ 59.

## PROCEDURAL HISTORY

Mr. Jefferson filed a Complaint on June 11, 2024, alleging violations of the National Defense Authorization Act, the False Claims Act, and the Sarbanes-Oxley Act. *See* Compl. ¶¶ 64–88. He seeks both declaratory and injunctive relief. *Id.* ¶ 90. The Defendants filed a Motion for Partial Dismissal, seeking dismissal of the False Claims Act and Sarbanes-Oxley Act claims. *See* Def.'s Mot., ECF No. 8. The motion is fully briefed. ECF Nos. 1, 8, 11, 13.

## LEGAL STANDARD

Under Rule 12(b)(6), courts must dismiss a complaint that does not "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Courts "must construe the complaint in favor of the plaintiff, who must be granted the benefit of all inferences that can be derived from the facts alleged." *Hettinga v. United States*, 677 F.3d 471, 476 (D.C. Cir. 2012) (internal quotation marks and citation omitted). But courts need not accept as true "a legal conclusion couched as a factual allegation," *Papasan v. Allain*, 478 U.S. 265, 286 (1986), nor an inference "unsupported by the facts set forth in the complaint," *Trudeau v. Fed. Trade Comm'n*, 456 F.3d 178, 193 (D.C. Cir. 2006) (quoting *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994)).

## DISCUSSION

The Defendants move to dismiss Mr. Jefferson's False Claims Act and Sarbanes-Oxley Act claims for failure to state a claim upon which relief can be granted. The Court denies the motion to dismiss the False Claims Act claim but dismisses the Sarbanes-Oxley Act claim.

### 1.    False Claims Act

The False Claims Act imposes a civil penalty and treble damages on any individual who, among other things, "knowingly presents, or causes to be presented a false or fraudulent claim for payment or approval." 31 U.S.C. § 3729(a)(1)(A). The Act authorizes private citizens to bring civil actions in the government's name to recover damages from those who engage in prohibited conduct, *id.* § 3730(b)(1), and the government has the option of taking over the lawsuit or leaving it to the private party to prosecute, *id.* §§ 3730(b)(4)(A)–(B).

In 1986, Congress amended the False Claims Act to add a whistleblower protection provision "in response to concern that employees who exposed false claims were being punished by their companies[.]" *United States ex rel. Yesudian v. Howard University*, 153 F.3d 731, 736 (D.C. Cir. 1998). That provision, Section 3730(h), empowers an employee to sue for retaliation:

> Any employee who is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment by his or her employer because of lawful acts done by the employee . . . in furtherance of an action under this section . . . shall be entitled to all relief necessary to make the employee whole.

31 U.S.C. § 3730(h). To establish a retaliation claim under this provision, "an employee must demonstrate that: (1) he engaged in protected activity, that is, 'acts done . . . in furtherance of an action under this section'; and (2) he was discriminated against 'because of' that activity." *Yesudian*, 153 F.3d at 736.

As to the first element, "[m]ere dissatisfaction with one's treatment on the job is not . . . enough." *Id.* at 740. "Nor is an employee's investigation of nothing more than his employer's non-compliance with federal or state regulations. . . . To be covered by the False Claims Act, the plaintiff's investigation must concern 'false or fraudulent' claims." *Id.* (citations omitted). And "while the employee must be investigating matters which are calculated, or reasonably could lead, to a viable [False Claims Act] action, it is not necessary for a plaintiff to know that the investigation could lead to a False Claims Act suit." *Shekoyan v. Sibley Int'l*, 409 F.3d 414, 423 (D.C. Cir. 2005) (cleaned up).

On the second element, "the employee must demonstrate that the employer had knowledge of the employee's protected activity and that the retaliation was motivated by the protected activity." *Hicks v. District of Columbia*, 306 F. Supp. 3d 131, 157 (D.D.C. 2018) (cleaned up). This is because "[u]nless the employer is aware that the employee is investigating fraud, . . . the

employer could not possess the retaliatory intent necessary to establish a violation of § 3730(h)." *Brady v. Liquidity Servs., Inc.*, No. 18-cv-1040, 2018 WL 6267766, at *3 (D.D.C. Nov. 30, 2018) (quoting *United States ex rel. Williams v. Martin-Baker Aircraft Co., Ltd.*, 389 F.3d 1251, 1260–61 (D.C. Cir. 2004)).

Mr. Jefferson clears the bar at this stage on both elements of his claim. The Defendants do not appear to challenge the first element in their motion. Defs.' Mot. 3–7. This comes as no surprise given that Mr. Jefferson complained about fraud on several occasions. And his "actions matched [his] words of protest." *Singletary v. Howard University*, 939 F.3d 287, 298 (D.C. Cir. 2019) (citation omitted). He reported to SAIC management and U.S. Air Force officials that "SAIC had failed to disclose . . . substandard policies and procedures relating to the prevention of timely detection of unauthorized acquisitions, use, or disposition of SAIC's assets." Compl. ¶ 60. He also complained that "SAIC employees were reporting to the United States Government that SAIC was compliant and maintained internal security controls when the company did not." *Id.* ¶ 38. He emailed SAIC's Deputy Program Manager to notify him that "SAIC was out of compliance." *Id.* ¶ 39. And he alerted SAIC management that its employees were "making improper changes to policies . . . and committing fraud[.]" *Id.* ¶ 43; *see also id.* ¶ 32 (disclosing SAIC "was using incorrect metrics for reporting material information about cybersecurity risk management, strategy, and governance to stockholders and the [SEC]"); *id.* ¶ 44 (describing "the fraudulent action and infractions" by SAIC employees); *id.* ¶ 46 (emailing SAIC management to state that he "disagreed with [SAIC management's] decision not to take action regarding his concerns" of fraudulent activity); *id.* ¶ 56 (explaining that he was "being retaliated against for raising concerns about cybersecurity deficiencies"); *id.* ¶ 58 (stating SAIC officials were "committing fraud" and that they had "consistently lied to the government").

The Defendants contest the second element, arguing that "SAIC was not on notice of [Mr. Jefferson's] engaging in protected activity under the [statute], because his reporting security concerns and issues was a fundamental part of his ordinary job duties." Defs.' Mot. at 5. The Court disagrees. The D.C. Circuit has explained that an employee whose normal job functions include audit responsibilities need not "incant talismanic words to satisfy the notice element[.]" *United States ex rel. Williams*, 389 F.3d at 1262. Accepting the allegations in the Complaint as true, Mr. Jefferson's reporting went well beyond his normal job duties. He informed SAIC executive and management personnel that "they were committing fraud against the U.S. Government" that "cost taxpayers billions of dollars annually" and that "they had consistently lied to the government." Compl. ¶ 58. And he sent emails to members of the U.S. Air Force about "problems in [SAIC's] vulnerability management process." *Id.* ¶ 37. In a management meeting with the U.S. Air Force Director of Communications and SAIC management, he "explained that SAIC . . . [was] making improper changes to policies, the . . . contract, and committing fraud, waste, and abuse." *Id.* ¶ 43. Mr. Jefferson, throughout his employment, persistently alerted SAIC management and personnel that he "noticed deficiencies in [SAIC's] internal security control reporting . . . [,] that the company was using incorrect metrics for reporting material information," *id.* ¶ 32, that it had "issues and vulnerabilities in [its] IT system," *id.* ¶ 33, and that it "was out of compliance," *id.* ¶ 39. He further explained that SAIC was "making improper changes to policies," *id.* ¶ 43, committing "fraudulent action and infractions," *id.* ¶ 44, and "not . . .tak[ing] action regarding" these fraudulent activities, *id.* ¶ 46. He also explained to SAIC's HR that he was being retaliated against for "raising [these] concerns about cybersecurity deficiencies[.]" *Id.* ¶ 56.

Indeed, the Defendants' own reactions to Mr. Jefferson's reporting establish that they were on notice. In a "management meeting" where Mr. Jefferson explained that SAIC was "committing

fraud, waste, and abuse," *id.* ¶ 43, SAIC's Program Director asked Mr. Jefferson to "play ball" and be a "team player," *id.* ¶ 45. After that meeting, Mr. Jefferson "sent a follow-up email" to management "disagree[ing] with their decision not to take action regarding his concerns," and SAIC's Program Director demanded Mr. Jefferson "recall the email" and "threatened [him] asking, 'Do you still want to work here?'" *Id.* ¶¶ 46–47. These allegations are sufficient to establish notice of protected activity at this stage. *See United States ex rel. Williams* at 1262 ("Notice can be accomplished by . . . any action which a factfinder reasonably could conclude would put the employer on notice that litigation is a reasonable possibility." (cleaned up)); *see also United States ex rel. Schweizer v. Oce N.V.*, 677 F.3d 1228, 1239 (D.C. Cir. 2012) (holding that the plaintiff engaged in protected activity under FCA because she "repeatedly disobeyed the orders of . . . her supervisor[] to stop investigating," and "did so despite [her supervisor's] warnings that the company would 'destroy' her if she did not comply").

Critically, Mr. Jefferson also reported his concerns to individuals outside his traditional chain of command, like SAIC's CEO and U.S. Air Force personnel. "[W]hen an employee acts outside his normal job responsibilities or alerts a party outside the usual chain of command, such action may suffice to notify the employer that the employee is engaging in protected activity." *United States ex rel. Williams*, 389 F.3d at 1261; *see, e.g.*, *Moses v. Neighborhood Reinvestment Corporation*, No. 23-cv-2246, 2024 WL 4103699, at *6 (D.D.C. Sept. 3, 2024) (plaintiff ignored "the chain of command" and reported the alleged fraud to his higher-ups); *Omwenga v. United Nations Foundation*, 244 F. Supp. 3d 214, 220 (D.D.C. 2017) (plaintiff spoke to a corporate attorney outside the plaintiff's reporting channels); *Sharma v. District of Columbia*, 791 F. Supp. 2d 207, 219 (D.D.C. 2011) (plaintiff went outside the institution to report fraud).

At bottom, taking all reasonable inferences in favor of Mr. Jefferson, he has satisfactorily alleged both elements of his False Claims Act claim. The Court denies the motion as to this claim.

### 2.    Sarbanes-Oxley Act

The Sarbanes-Oxley Act protects employees of publicly traded companies who report illegal activities. *See* 18 U.S.C. § 1514A. To encourage the disclosure of corporate fraud, Section 806 of the Act authorizes employees to file complaints with the Secretary of Labor or lawsuits in federal district courts if they are retaliated against for engaging in protected whistleblower activity. *See Garvey v. Admin. Rev. Bd., United States Dep't of Lab.*, 56 F.4th 110, 115 (D.C. Cir. 2022).

In *Garvey v. Administrative Review Board*, the D.C. Circuit addressed whether Section 806 applies extraterritorially. *Id.* at 115. The Court carefully analyzed the competing interests and held that the provision does not apply extraterritorially to employees working overseas. *Id.* at 123. There, the plaintiff was a U.S. citizen working abroad for a foreign subsidiary of a U.S. company. *Id.* at 115, 128. After the plaintiff raised concerns with his superiors in New York "regarding potential U.S. securities law violations" that "affect[ed] U.S. markets," he faced retaliation that caused him to resign. *Id.* at 115, 119.

Having found that Section 806 does not apply extraterritorially, the Court went on to assess whether these facts involved a domestic application of the statute. *Id.* at 126–28. Given that the "focus" of Section 806 is "prohibiting covered employers from retaliating against employees for engaging in the protected activities enumerated in the statute," the Court set out a two-part test for determining whether there is a domestic application of the statute. *Id.* at 127. In "assessing" claims under Section 806, courts must consider the (1) "the locus of an employee's work" and (2) "the terms of his . . . employment contract." *Id.*

Applying this test, the D.C. Circuit found no domestic application of Section 806 where the locus of the plaintiff's employment was Asia—where he worked exclusively—and the relevant employment agreement was governed by Hong Kong law. *Id.* at 128. The Court was unpersuaded that other facts—including the plaintiff's U.S. citizenship, his employment with a subsidiary of a U.S. company, or the fraud affecting U.S. markets—"change[d] the overseas locus of [the plaintiff's] employment [or] ma[d]e the conduct domestic." *Id.*

Applying *Garvey* to this case, the Defendants argue that Mr. Jefferson's claim is an extraterritorial application of Section 806. Defs.' Mot. at 8. The Court agrees.

*First*, the locus of Mr. Jefferson's employment was Germany, not the United States. His Complaint alleges that he worked exclusively in Germany. *See* Compl. ¶ 2. Mr. Jefferson's only response on this point is that he worked on a U.S. military base in Germany. *See* Pl.'s Opp'n at 7. Without explaining further, he appears to argue that a U.S. military base is necessarily the United States when analyzing the domestic application of the statute. Not so. Generally, where "the United States has not demonstrated intent to exercise sovereignty over" a U.S. military base, it does not constitute de facto U.S. territory. *Adhikari v. Kellogg Brown & Root, Inc.*, 845 F.3d 184, 197 (5th Cir. 2017) (quoting *Marshall v. Exelis Sys. Corp.*, No. 13-cv-545, 2014 WL 1213473, at *6 (D. Colo. Mar. 24, 2014)); *see also Al Maqaleh v. Gates*, 605 F.3d 84, 97 (D.C. Cir. 2010). Mr. Jefferson has not alleged that the United States exercises sovereignty over USAFE-AFAFRICA Warfare Center at Einsiedlerhof Air Station, Germany, where he was stationed, and he has offered no support for his apparent assertion that the military base is the United States.[1]

---

[1] At least one court has said that "Germany retains exclusive jurisdiction" within its borders. *See United States v. Morton*, 314 F. Supp. 2d 509, 514 (D. Md. 2004); *see also* Agreement between the Parties to the North Atlantic Treaty Regarding the Status of Their Forces, art. VII, June 19, 1951, 4 U.S.T. 1792, T.I.A.S. No. 2846 (entered into force on Aug. 23, 1953) (providing that "the sending State [United States] shall have the primary right to exercise jurisdiction over a member

*Second*, turning to the terms and conditions of Mr. Jefferson's employment, he has not pleaded sufficient domestic facts. "Unless a statute provides otherwise, a U.S. law regulating an employee's terms and conditions of employment does not automatically confer protections to individuals . . . who have opted to work outside the United States." *Garvey*, 56 F.4th at 128 (finding no domestic application where the plaintiff's employer was a foreign subsidiary of a U.S. company and his "employment agreement [was] governed by the laws of a [foreign nation]"); *Daramola v. Oracle America, Inc*., 92 F.4th 833, 840 (9th Cir. 2024) (same); *Carnero v. Boston Scientific Corp*., 433 F.3d 1, 18 n.2 (2d Cir. 2006) (same). While Mr. Jefferson has alleged that he worked for SAIC, a U.S. company, *see* Compl. ¶¶ 2, 30, his Complaint is devoid of any allegations about his employment contract or the law that governs it, *see* Compl. ¶ 30. Without more, the Court cannot presume that his contract is governed by U.S. law when he works in Germany.

Mr. Jefferson relies on two out-of-circuit cases finding a domestic application of the Sarbanes-Oxley Act where the plaintiffs were located overseas. *See* Pl.'s Opp'n at 8–9. But the alleged retaliation in those cases occurred in the United States. *See O'Mahony v. Accenture Ltd*., 537 F.Supp.2d 506, 514–15 (S.D.N.Y. 2008) (finding that the "retaliation against [the plaintiff] for reporting the fraud occurred in the United States" even though the plaintiff was employed in France); *Prout v. Vladeck*, 316 F. Supp. 3d 784, 804 (S.D.N.Y. 2018) (giving weight to the fact

---

of a force or of a civilian component in relation to [...] [offenses] solely [...] against the person or property of another member of the force or civilian component of that State or of a dependent[,]" but "[i]n the case of any other [offense] the authorities of the receiving State [Germany] shall have the primary right to exercise jurisdiction"); USAREUR Reg. 550–56; USNAVEUR Instr. 5820–13C; & USAFE Reg.1 10–6, *Exercise of Jurisdiction by German Courts and Authorities Over U.S. Personnel* (Dec. 17, 1992) ("For U.S. civilian and dependent personnel, German jurisdiction is exclusive.").

that the retaliation occurred in the United States).[2] *Garvey* made clear that "if the conduct relevant to the focus occurred in a foreign country, then the case involves an impermissible extraterritorial application." *Garvey*, 56 F.4th at 127 (quoting *RJR Nabisco v. Eur. Cmty.*, 579 U.S. 325, 337 (2016)). And the "clear focus" of Section 806 is "prohibiting covered employers from retaliating against employees." *Garvey*, 56 F.4th at 127. Here, all of the alleged retaliatory conduct—Mr. Jefferson's demotion, removal from the GSA contract, placement on unpaid leave, and termination—took place in Germany. *See id.* ¶¶ 49, 57, 59.

In urging this Court to find a domestic application of Section 806 here, Mr. Jefferson also points to his U.S. citizenship and the fact that a U.S. company perpetrated the alleged wrongdoing. *See* Pl.'s Opp'n at 7–9. But these allegations, standing alone, do not compel a domestic application of Section 806. *See, e.g.*, *Garvey*, 56 F.4th at 128 (finding no domestic application of Section 806 where the plaintiff was a U.S. citizen, and the alleged fraud was perpetrated by the U.S. parent company's employees). Indeed, most cases will have *some* domestic features. *See, e.g.*, *Morrison v. Nat'l Austl. Bank Ltd.*, 561 U.S. 255, 266 (2010) ("[T]he presumption against extraterritorial application would be a craven watchdog indeed if it retreated to its kennel whenever *some* domestic activity is involved in the case."); *Liu Meng-Lin v. Siemens AG*, 763 F.3d 175, 180 (2d Cir. 2014) ("[S]imply alleging that some domestic conduct occurred cannot support a claim of domestic application because it is a rare case of prohibited extraterritorial application that lacks *all* contact with the territory of the United States." (cleaned up)).[3]

---

[2] Mr. Jefferson also relies on *Smith v. Coupang Inc.*, No. 23-cv-1887, 2024 WL 3373085, at *2 (W.D. Wash. July 11, 2024), but the court there was not considering a domestic application of the Sarbanes-Oxley Act. Instead, the court permitted the plaintiff to amend the complaint to correct an error in the defendant's corporate name because that change, on its own, would not render the Act inapplicable. *Id.*

[3] In opposing the Defendants' motion, Mr. Jefferson also argues that SAIC executives in the United States were likely involved in the alleged retaliatory conduct. Pl.'s Opp'n at 8. But this allegation

At bottom, while Mr. Jefferson thinks the Sarbanes-Oxley Act should reach the allegations in this case, they fall short of the test the D.C. Circuit has set out. The D.C. Circuit painstakingly reviewed the text, context, and legislative history of Section 806 and concluded that Congress did not intend the provision to apply extraterritorially. And in analyzing the domestic application of Section 806, the Court was clear that "the locus of any employee's work and the terms of his or her employment are critically important." *Garvey*, 56 F.4th at 127. The record in this case simply does not support a domestic application of Section 806 under that framework.

## CONCLUSION

For these reasons, the Court denies in part and grants in part the Defendants' Partial Motion to Dismiss, ECF No. 8.

A separate order will issue.

---

SPARKLE L. SOOKNANAN
United States District Judge

Date:   May 6, 2025

---

is nowhere to be found in Mr. Jefferson's Complaint, so the Court does not consider it in deciding this motion. *See Singh v. District of Columbia*, 55 F. Supp. 3d 55, 70 (D.D.C. 2014) ("[I]t is 'axiomatic' that a party may not amend his complaint through an opposition brief."). Even if properly before the Court, it would not change the result. *See Garvey v. Admin. Rev. Bd., United States Dep't of Lab.*, 56 F.4th 110, 128 (D.C. Cir. 2022) (the fact that "corporate decisionmakers in the United States directed the retaliation campaign against [the plaintiff]" "neither change[s] the overseas locus of [the plaintiff]'s employment nor make[s] the conduct domestic" (citation omitted)).