**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| MARSEILLES JEFFERSON,<br>*Plaintiff*,<br>v.<br>SCIENCE APPLICATIONS INTERNATIONAL CORPORATION,<br>*Defendant*. | Civil Action No. 24-1692 (SLS)<br>Judge Sparkle L. Sooknanan |

# MEMORANDUM OPINION

Marseilles Jefferson was a lead cybersecurity systems administrator for the Science Applications International Corporation (SAIC) for roughly twenty months before his termination. SAIC contracts with the United States Air Force (Air Force) to provide support and services at a training and simulation center in Germany. In March 2022, Mr. Jefferson raised concerns that the cybersecurity head at that training center was trying to circumvent certain cybersecurity protections and best practices to the detriment of the federal government. Soon after, SAIC stripped Mr. Jefferson of his telework privileges, imposed written reprimands, placed him on leave, and ultimately terminated him. Mr. Jefferson brought this lawsuit to challenge these actions under various statutes, including the False Claims Act and the Defense Contractor Whistleblower Protection Act. SAIC now seeks summary judgment on both claims, and Mr. Jefferson seeks summary judgment on certain portions of his claim under the Defense Contractor Whistleblower Protection Act. For the reasons below, the Court grants SAIC's motion for summary judgment on the False Claims Act claim. But the Court denies summary judgment to both Parties on the Defense Contractor Whistleblower Protection Act claim, which will proceed to trial.

## BACKGROUND

### A. Statutory Background

"Generally, federal whistleblower protection statutes aim to uncover serious fraud against the government or critical health and safety violations by encouraging those with firsthand knowledge to come forward." *Kappouta v. Valiant Integrated Servs., LLC*, No. 20-cv-1501, 2021 WL 4806437, at *2 (S.D. Cal. Oct. 14, 2021), *aff'd*, 60 F.4th 1213 (9th Cir. 2023). Indeed, the term whistleblower "is derived from the act of an English bobby blowing his whistle upon becoming aware of the commission of a crime to alert other law enforcement officers and the public within the zone of danger." *Winters v. Houston Chron. Publ'g Co.*, 795 S.W.2d 723, 727 (Tex. 1990) (Doggett, J. concurring). Whistleblower protections have a long pedigree in American law. The Second Continental Congress passed the first American whistleblower protection statute in 1777 to protect revolutionary soldiers who reported their commanders "for treating[] prisoners in the most inhumane and barbarous manner." Elizabeth A. Williams, Note, *Blowing the Whistle While Gasping for Air*, 18 Loy. Mar. L.J. 219, 222 (2019) (cleaned up). That Act provided "[t]hat it is the duty of all persons in the service of the United States . . . to give the earliest information to Congress or any other proper authority of any misconduct, frauds or misdemeanors committed by any officers or persons in the service of these states[.]" *Id.* at 222–23 (cleaned up). This case concerns two whistleblower protections statutes that carry forward this longstanding tradition: the False Claims Act and the Defense Contractor Whistleblower Protection Act.

"The False Claims Act was adopted in 1863 and signed into law by President Abraham Lincoln in order to combat rampant fraud in Civil War defense contracts." *Kellogg Brown & Root Servs., Inc. v. U.S., ex rel. Carter*, 575 U.S. 650, 652–53 (2015) (quoting S. Rep. No. 99–345, at 8 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5266, 5273). The Act was a response to a "series of

sensational congressional investigations" into "large contractors during the Civil War" that "painted a sordid picture of how the United States had been billed for nonexistent or worthless goods, charged exorbitant prices for goods delivered, and generally robbed in purchasing the necessities of war." *Universal Health Servs., Inc. v. United States*, 579 U.S. 176, 181–82 (2016) (cleaned up). "Since then, Congress has repeatedly amended the Act[.]" *Id.* at 182. It now serves as "the government's primary litigative tool for the recovery of losses sustained as the result of fraud against the government." *Avco Corp. v. DOJ*, 884 F.2d 621, 622 (D.C. Cir. 1989) (citing S. Rep. No. 99-345, at 2 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5266). And the statute's purpose is to "incentivize whistleblowers to come forward when they become aware of fraud against the government, and to protect them from retaliation when they do." *United States ex rel. Sheldon v. Allergan Sales, LLC*, 170 F.4th 227, 232 (4th Cir. 2026) (cleaned up).

Congress enacted the False Claims Act's retaliation provision in 1986 "in response to concern that employees who exposed false claims were being punished by their companies[.]" *United States ex rel. Yesudian v. Howard Univ.*, 153 F.3d 731, 736 (D.C. Cir. 1998). In the Fraud Enforcement and Recovery Act of 2009 and the Dodd-Frank Act of 2010, this provision "was expanded to cover acts done by . . . contractors, agents, and associated others" as well. *Cestra v. Mylan, Inc.*, No. 14-cv-825, 2015 WL 2455420, at *10 n.5 (W.D. Pa. May 22, 2015). The retaliation provision broadly prohibits discharge, demotion, threat, harassment, or discrimination "in the terms and conditions of employment" of such individuals for engaging in activity protected by the False Claims Act. 31 U.S.C. § 3730(h)(1). The provision also seeks to "assure those who may be considering exposing fraud that they are legally protected from retaliatory acts." *Yesudian*, 153 F.3d at 736 (quoting S. Rep. No. 99–345, at 34 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5266, 5299).

Meanwhile, the Defense Contractor Whistleblower Protection Act "expand[s] whistleblower protection traditionally reserved for government employees to [Department of Defense] and [National Aeronautics and Space Administration] contractor's employees by prohibiting retaliation against those who report certain types protected information." *Kappouta*, 2021 WL 4806437, at *3. The Act was originally enacted in congressional defense appropriations in 1986 and has been reauthorized in various forms in federal appropriations bills since then. *See* Pub. L. No. 99–591, § 2409, 100 Stat. 3341–83, 3341–162 (Oct. 30, 1986); *Alden v. AECOM Tech. Corp.*, No. 18-cv-03258, 2021 WL 1405284, at *3 (N.D. Cal. Apr. 14, 2021) (explaining development of statute over time). The current version of the statute was largely enacted in the National Defense Authorization Act for Fiscal Year 2021, Pub. L. No. 116-283, § 1863, 134 Stat. 4278 (Jan. 1, 2021) (codified at 10 U.S.C. § 4701). The Act provides that employees of defense contractors cannot be "discharged, demoted, or otherwise discriminated against as a reprisal for disclosing . . . [g]ross mismanagement of a Department of Defense contract or grant, a gross waste of Department funds, an abuse of authority relating to a Department contract or grant, or a violation of law, rule, or regulation related to a Department contract (including the competition for or negotiation of a contract) or grant." 10 U.S.C. § 4701(a)(1)(A).

**B. Factual Background**

The Court draws the facts from the Statements of Material Facts submitted by the Parties as well as the underlying materials referenced in those statements. *See* Joint Statement of Facts (JSF), ECF No. 49;[1] Joint Agreed Upon Statement of Undisputed Facts, ECF No. 50.

[1] The Joint Statement of Facts contains two separately numbered lists of asserted undisputed facts from each Party. For clarity, this Memorandum Opinion will cite the Defendant's facts as DJSF, and the Plaintiff's as PJSF.

The "United States Air Forces in Europe and Air Forces Africa Warfare Center" (War Center), located in Kaiserslautern, Germany, "is a training and simulation center" used "to train [Air Force] servicemembers and [North Atlantic Treaty Organization] partners . . . in air operations" and "provide opportunities to practice skills outside of an actual combat or warfare event." DJSF ¶¶ 3–5. The War Center runs complicated virtual simulations where participants select targets, weapons to attack those targets, and aircraft to carry the weapons, and determine what support is needed. JSUF ¶ 6. "The exercises involve what is essentially a 'video game' environment through which personnel can practice skills and strategy in a virtual and simulated environment on closed computer networks specifically owned by the United States Air Force, involving various aircraft and air personnel." DJSF ¶ 7.

The Defense Information Systems Agency is tasked with performing security vulnerability scans for the Department of Defense (DoD) as a type of security control, and sets certain Security Technical Implementation Guidelines that govern the scans. JSUF ¶¶ 15, 39. These guidelines are "configurations for computers and servers, primarily orientated around what operating system they are running." *Id.* Assured Compliance Assessment Solution (ACAS) is a monitoring security program used to scan DoD networks and connected IT systems that satisfies the Security Technical Implementation Guidelines. *Id.* ACAS scans are uploaded into a system known as EMASS, which is also used for accreditation. JSUF ¶ 43.

SAIC is an independent contractor that provides support and services for the Air Force's models and simulation program at the War Center. JSUF ¶ 3. On December 5, 2020, around the time that SAIC won the Air Force contract, Mr. Jefferson began his employment with SAIC as a Cybersecurity Systems Administrator at the War Center. JSUF ¶¶ 1–2. Mr. Jefferson teleworked

to give him the flexibility to attend his wife's medical appointments—as she had suffered a minor stroke—and to care for his young child. JSUF ¶¶ 82, 84, 88.

In approximately November 2021, Mr. Jefferson sent multiple emails to SAIC management detailing purported critical ACAS issues and vulnerabilities in the War Center's IT system. JSUF ¶ 48. In December 2021, Mr. Jefferson reported that he was implementing numerous fixes "to combat purported vulnerability issues with ACAS." JSUF ¶ 49. Shortly after, on February 4, 2022, SAIC gave Mr. Jefferson a lead supervisory role on the team and approved an increase in compensation because of that role. JSUF ¶ 50. As part of his duties, Mr. Jefferson was to assess vulnerabilities, run scans on War Center networks, and give recommendations. JSF ¶ 18.

In March 2022, Reuben Gjellstad, a civil Air Force employee, became the Information System Security Manager (ISSM) leading cybersecurity at the War Center. JSUF ¶¶ 30–31, 53. ISSM Gjellstad reported to Jonathan Powell, the Air Force Commander and Information Systems Owner (ISO) at the War Center. JSUF ¶ 32. Commander Powell had the authority to waive certain policies to complete the War Center's mission. JSUF ¶ 18. Matthew Jamison was the Site Lead/Project Manager who managed War Center operations on site. JSUF ¶ 24. Allen Johnson, an IT Manager, was Mr. Jefferson's immediate supervisor. JSUF ¶ 27.

On March 23, 2022, Mr. Jefferson provided Air Force and SAIC management with his regular, weekly "Vulnerability Summary" of the War Center network. JSUF ¶ 55. ISSM Gjellstad responded by requesting that Mr. Jefferson create an account for him on each of their ACAS servers and set up a time to meet, noting that he wanted to determine "what we need[ed] to internally track" under relevant Air Force guidelines. JSUF ¶ 56. Mr. Jefferson asked for more specificity about the request. JSUF ¶ 57. ISSM Gjellstad responded that the Air Force

> only requires the [Security Technical Implementation Guidelines] and ACAS scans for persistently connected systems to be uploaded into eMASS. Systems that are

> temporary (e.g. exercise workstations, event-based M&S builds, etc) or are not realistically/effectively scannable (e.g. VoIPs) should be excluded. Not sure if our ACAS asset groups are already built this way, if not, we can discuss the best way to get there.

*Id.* Mr. Jefferson replied that he could not find guidance in the Defense Information Systems Agency's Best Practices Guide "about not scanning temporary workstations." JSUF ¶ 58. And ISSM Gjellstad responded that there were different requirements "tailored specifically for unique training enclaves like [the War Center]," and that he would prepare the relevant forms and trainings for those requirements. JSUF ¶ 59. He requested that, in the meantime, Mr. Jefferson "create ACAS accounts for him on multiple servers." *Id.* Mr. Jefferson responded, copying Commander Powell and his SAIC management, stating that he felt uncomfortable deviating from the Defense Information Systems Agency's policies and requesting written confirmation from Commander Powell before moving forward with ISSM Gjellstad's request. JSUF ¶ 60. Commander Powell never responded to Mr. Jefferson. JSUF ¶ 61.

On March 28, 2022, ISSM Gjellstad met with Mr. Jefferson regarding their email exchange. PJSF ¶ 29. In that meeting, ISSM Gjellstad and Mr. Jefferson aired disagreements, and Mr. Jefferson suggested that ISSM Gjellstad had a conflict of interest because he had previously worked for SAIC. PJSF ¶ 30. At the same meeting, ISSM Gjellstad informed Mr. Jefferson that he intended to end telework at the War Center. PJSF ¶ 31.

On or around April 7, 2022, Mr. Jefferson participated in a meeting with Commander Powell, Mr. Jamison, and SAIC management. PJSF ¶ 32. The Parties dispute what was said at that meeting. *Id.* But the next day, Mr. Jefferson sent a follow-up email to ISSM Gjellstad, Commander Powell, Mr. Jamison, and SAIC management raising concerns about equipment and other issues, and making clear that it was his job to accurately report "fraud, waste, and/or abuse." PJSF ¶ 34; Pl. Ex. V, ECF No. 20. In response, ISSM Gjellstad told Mr. Jefferson

that many of the things that he said were not wrong, and that he had made notes of Mr. Jefferson's suggestions for improvement. PJSF ¶ 35.

Mr. Jamison forwarded the email to Bryan Newman, an Employee Relations Analyst at SAIC, with the following note:

> [R]egretfully I'm seeking your guidance regarding an employee's action last week. [Another employee] attended a meeting with the customer and Marselles Jefferson regarding performance and tasking, that Marselles had objections with. . . . [A]t the conclusion of the meeting their [sic] appeared to be a gentlemen's agreement on a path forward. However it appears that Marselles, was not satisfied of the outcome of this meeting and decided to draft and send the below email thread, to his government counterpart the Information Systems Security Manager (ISSM), and the Director of the WPC.
>
> I am seeking your assistance, to *determine the appropriate disciplinary actions* for these actions. Please review the below threads and advise me of policy and or procedures that may have been violated, as *I intend to provide a written reprimand* for these actions.

Pl.'s Ex. V (emphasis added); *see also* JSUF ¶ 139. Mr. Newman responded:

> It's not unheard of for some employees to not be satisfied with something being done and then going up to the CEO or EVP of HR to make their voice heard. It's not the right way to do it but we see it often. We haven't disciplined those employees but worked with the managers to address the issue with the employee separately.

Pl.'s Ex. V. Mr. Newman suggested:

> [I]t would be best to pull Marselles to the side, indicate that you received word that he escalated the matter to the government, and that it was not necessary to do that and that if he has any concerns, he needs to work with his management team and not go through unauthorized channels. It can be treated as a verbal counseling.

*Id.* But Mr. Johnson replied by stressing that they were in the "middle" of negotiations for a new contract with Commander Powell; that he thought a "gentlemen['s] agreement" had been reached in the meeting with Mr. Jefferson; and that it was Mr. Jefferson's "lack of willingness to resolve the matters that concerned him." *Id.*

On April 14, 2024, Mr. Johnson delivered a written warning letter to Mr. Jefferson citing standards of conduct, workplace behavior, communication, and conflict resolution as areas of improvement. PJSF ¶ 36. Around that time, Mr. Johnson also advised Mr. Jefferson that he needed to provide additional doctors' notes to verify that he was caring for a disabled spouse and small child to justify his telework in light of Air Force policy. JSUF ¶ 85. Mr. Jefferson promptly provided a previous doctor's note and promised to provide an updated note after his wife's next doctor's appointment. JSUF ¶ 86.

On April 27, 2022, Mr. Jamison and Mr. Johnson met with Mr. Jefferson and expressed that the government was no longer confident in Mr. Jefferson's work. *Id.* They pointed to his April 8, 2022, email as evidence that he had become disgruntled. *Id.* Mr. Johnson suggested paid leave as an opportunity for Mr. Jefferson to get away from work and try to set a new course when he returned. JSUF ¶ 87. Mr. Jamison and Mr. Johnson also told Mr. Jefferson that he could not continue in his supervisory role and relieved him of his ACAS duties. PJSF ¶ 40.

On April 28, 2022, Mr. Jefferson began six weeks of Family Medical Leave. PJSF ¶ 41. On May 17, 2022, Mr. Jefferson sent an email to Mr. Jamison and Mr. Johnson recapping their in-person April 27, 2022, meeting and stating an intention to start afresh on his return. PJSF ¶ 42; JSUF ¶ 93. Mr. Jefferson returned from leave on June 13, 2022. JSUF ¶ 95.

On June 15, 2022, Mr. Jefferson sent an email to Mr. Johnson and SAIC management with the subject line "Retaliation for Whistleblowing," where Mr. Jefferson outlined alleged retaliatory actions by ISSM Gjellstad and Commander Powell, including (1) informing SAIC that he could not telework, (2) removing his ACAS access, (3) refusing to give written as opposed to verbal confirmations to ensure accountability, (4) lying about his PTO requests, (5) lying about deliverables, (6) requesting medical documentation only to deny telework, (7) telling his employer

that they were not confident in his work after he complained about fraud, waste, and abuses, and (8) requesting that he take a leave of absence. Pl. Ex. EE, ECF No. 27-24. Mr. Jefferson expressed his view that they were attempting to setup a "structure" "so that they could get around DoD policy." *Id.* He further stated that there was a "conflict of interest." *Id.* Mr. Jefferson noted that he would seek advice and consider filing a complaint with the Office of the Inspector General. *Id.*

In response, SAIC drafted a series of reprimand letters for work performance that it ultimately did not send to Mr. Jefferson. Instead, SAIC asked if he would be willing to transfer to another facility. JSUF ¶¶ 100–08. Mr. Jefferson refused. *Id.* Mr. Jamison forwarded Mr. Jefferson's email to Employee Relations with the message below:

> Mr. Marseilles Jefferson is making some serious allegations against both SAIC and the government. We have given him a warning letter, compelled him to take time off to "reset," and offered to move him to a position which would allow telework. . . . I believe we are now at an impasse with regard to whether Mr. Jefferson can function on this program. I don't believe additional written warnings will resolve the situation.

Pl. Ex. EE.

Shortly after, Mr. Jamison responded to Mr. Jefferson's June 15, 2022, email noting that he had "outlined serious allegations" but stating:

> Your position is a full time salaried position. Mr. Powell has mandated no telework. I expect you to be at work even if you think it can be done from home. You recently utilized family medical leave, are you pursuing additional reduced work programs associated with this?

Pl. Ex. FF, ECF No. 29-10. Mr. Jefferson responded:

> I'll be here daily . . . except for when any medical need arises, PTO, etc. Since my wife's appointments have been disrupted, the schedule has changed. I'll make up the hours and take PTO as needed. Am I no longer allowed to make up hours either? Like I told you before I left, I'm here to do my job (full-time) and to the best of my ability without causing any problems.

*Id.*

On June 21, 2022, a little over a week after Mr. Jefferson returned from six weeks of family leave, Air Force officials requested a "Problem Notification Report" on whether Mr. Jefferson had missed deliverables. JSUF ¶ 109. Mr. Jamison coordinated with SAIC management and ISSM Gjellstad to prepare this report. JSUF ¶ 119. Mr. Jefferson complained to SAIC management that the report was harassment in response to his allegation of retaliation, describing the process as "bothering" him. JSUF ¶¶ 123, 125.

On July 5, 2022, Mr. Jefferson inquired with human resources about the process to file a formal complaint with SAIC. JSUF ¶ 130. Less than a week later, on July 11, 2022, SAIC placed Mr. Jefferson on leave-without-pay status for four weeks, claiming that it needed time to investigate an ethical allegation by the Air Force about his timekeeping. JSUF ¶¶ 131, 134. But Commander Powell only filed a formal ethics complaint about Mr. Jefferson's timecard usage and performance on July 14, 2022, days *after* SAIC placed him on leave without pay for alleged timekeeping issues. JSUF ¶ 137. On July 19, 2022, Mr. Jefferson filed a retaliation complaint against Mr. Jamison and Mr. Johnson. JSUF ¶ 138. And on August 5, 2022, Mr. Jefferson emailed SAIC executives, human resources, and management, alleging that they were committing fraud against and lying to the U.S. Government by making false claims, submitting improper security controls, and providing false information that created risks to national security. JSUF ¶ 136.

On August 5, 2022, SAIC notified Mr. Jefferson that his leave without pay was being extended, pending SAIC's resolution of internal matters through its legal department. JSUF ¶ 145. A few weeks later, on August 29, 2022, SAIC terminated Mr. Jefferson for insubordination, violation of the SAIC Code of Conduct, refusal to comply with company investigations, and other reasons. JSUF ¶ 146. According to SAIC management, around the same time, Air Force officials told them that Mr. Jefferson was no longer permitted on War Center property. JSUF ¶ 127.

Sometime after Mr. Jefferson's termination, a security clearance investigator contacted Mr. Jamison about Mr. Jefferson. JSUF ¶ 149. When asked if Mr. Jamison had faith that Mr. Jefferson could operate U.S. classified and unclassified systems, Mr. Jamison answered no. *Id.*

### C. Procedural Background

Mr. Jefferson filed this whistleblower action against SAIC and SAIC managers in June 2024, alleging that their conduct violated whistleblower protections in the Defense Contractor Whistleblower Protection Act, 10 U.S.C. § 4701;[2] the False Claims Act, 31 U.S.C. § 3730(h); and the Sarbanes-Oxley Act, 18 U.S.C. § 1514A. Compl., ECF No. 1. The Defendants moved to partially dismiss those claims and the Court granted that motion in part by dismissing Mr. Jefferson's Sarbanes-Oxley Act claim. *Jefferson v. Sci. Applications Int'l Corp.*, No. 24-cv-1692, 2025 WL 1305245, at *3 (D.D.C. May 6, 2025). This ruling had the effect of dismissing all claims against the individual defendants, leaving SAIC as the only Defendant. Following discovery, SAIC now moves for summary judgment, Def.'s Mot. Summ. J., ECF No. 25, and Mr. Jefferson moves for partial summary judgment, Pl.'s Mot. Summ. J., ECF No. 27. These motions are fully briefed and ripe for review. *See* Def.'s Opp'n to Pl.'s Mot. Summ. J., ECF No. 36; Pl.'s Opp'n to Def.'s Mot. Summ. J. (Pl.'s Resp.), ECF No. 40; Def.'s Reply, ECF No. 41; Pl.'s Reply, ECF No. 42.

## LEGAL STANDARD

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

---

[2] At times, the Parties refer to 10 U.S.C. § 4701 as the National Defense Authorization Act (NDAA). That statute is the Defense Contractor Whistleblower Protection Act, which was amended by the NDAA. For clarity, the Court will refer to 10 U.S.C. § 4701 as the Defense Contractor Whistleblower Protection Act.

Fed. R. Civ. P. 56(a). "The burden is on the movant to make the initial showing of the absence of any genuine issues of material fact." *Ehrman v. United States*, 429 F. Supp. 2d 61, 66 (D.D.C. 2006) (citations omitted). "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [its] favor." *Est. of Parsons v. Palestinian Auth.*, 651 F.3d 118, 123 (D.C. Cir. 2011) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). When "both parties file cross-motions for summary judgment, each must carry its own burden under the applicable legal standard." *Ehrman*, 429 F. Supp. 2d. at 67 (citations omitted).

## DISCUSSION

SAIC seeks summary judgment on Mr. Jefferson's remaining claims under the False Claims Act and the Defense Contractor Whistleblower Protection Act. And Mr. Jefferson seeks partial summary judgment on four elements of his Defense Contractor Whistleblower Protection Act claim. The Court grants in part and denies in part SAIC's motion. A reasonable jury could find for Mr. Jefferson on his Defense Contractor Whistleblower Protection Act claim but not his False Claims Act claim. And the Court denies Mr. Jefferson's partial motion. The issues on which he seeks summary judgment are factual ones that a reasonable jury could dispute and thus inappropriate for resolution at this stage.

### A. False Claims Act

Starting with Mr. Jefferson's whistleblower retaliation claim under the False Claims Act, to establish such a claim, "an employee must demonstrate that: (1) he engaged in protected activity, that is, acts done . . . in furtherance of an action under this section; and (2) he was discriminated against because of that activity." *Yesudian*, 153 F.3d at 736 (cleaned up). On the first element, "the [False Claims Act] covers two forms of protected activity." *United States ex rel. Kini v. Tata Consultancy Servs.*, 146 F.4th 1184, 1195 (D.C. Cir. 2025). The first is "steps taken antecedent to a False Claims Act proceeding," *i.e.*, an "investigation" concerning "false or fraudulent statements

or records concealing, avoiding, or decreasing an obligation to pay the government." *Id.* (cleaned up). The second is "lawful acts done in furtherance of other efforts to stop 1 or more violations of" the False Claims Act. *Id.* (cleaned up). The latter is only protected if the plaintiff can show "an objectively reasonable belief that the employer is violating, or will violate," the Act. *Id.* (cleaned up).

Here, Mr. Jefferson argues that he engaged in both categories of protected activity because he was investigating and "actively trying to stop" violations of the False Claims Act's conversion provision, which prohibits one who "has possession, custody, or control of property or money used, or to be used, by the Government and knowingly delivers, or causes to be delivered, less than all of that money or property." Pl.'s Opp'n. 3; 31 U.S.C. § 3729(a)(1)(D).[3] But to succeed on such a claim, a plaintiff must "identify" some money or "specific excess or recoverable item or other property that [the defendant] possessed but failed to deliver to the government." *United States ex rel. Foreman v. AECOM*, 19 F.4th 85, 122 (2d Cir. 2021) (quoting *United States ex rel. Foreman v. AECOM*, 454 F. Supp. 3d 254, 268 (S.D.N.Y. 2020), and citing *United States ex rel. Kasowitz Benson Torres LLP v. BASF Corporation*, 929 F.3d 721, 728 (D.C. Cir. 2019)). Mr. Jefferson has not done so.

[3] Although Mr. Jefferson notes that his "reports did not solely raise concerns about SAIC's possible reverse false claims liability," his brief focuses only on the conversion provision and fails to make any argument about reverse false claims liability. Pl.'s Opp'n. 2–3. Thus, he has forfeited reliance on a reverse false claims theory of liability. "Mentioning an argument 'in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones' is tantamount to failing to raise it." *Am. First Legal Found. v. GAO*, 819 F. Supp. 3d 20, 29 (D.D.C. 2026) (quoting *Al-Tamimi v. Adelson*, 916 F.3d 1, 6 (D.C. Cir. 2019)).

**1. Equipment**

Mr. Jefferson complained about certain equipment at the war center. This aspect of Mr. Jefferson's claim centers on the following complaint to ISSM Gjellstad and other Air Force officials:

> Th[ere] is millions of dollars of equipment that has been sitting on the floor and/or racks collecting dust for the last several years. Did anybody even conduct a feasibility study or considered the operational costs of purchasing specialized equipment no one knows who [sic] to use? There are tens of thousands of dollars in additional equipment we can't even use on our closed network.

Def. Ex. 12, ECF No. 25-114. This complaint alone falls well short of what is needed to survive summary judgment. Mr. Jefferson does not dispute that the equipment that he complained of was not "purchased by or owned by SAIC," DJSF ¶ 119, and he concedes that he has no "idea where that equipment came from, and who owns it," DJSF ¶¶ 120. He says only that the record evidence is "vague and speculative concerning whether SAIC had any obligations to ensure" that the equipment "was secured, evaluated, maintained, and preserved pending the government's decision about it." DJSF ¶ 122. But the undisputed record is not vague. It reveals that the equipment predates SAIC's contract with the War Center. DJSF ¶¶ 120–21. And SAIC contends that it does not purchase or otherwise provide equipment to the War Center, citing plenty of record evidence to support that assertion. DJSF ¶¶ 119, 21; Def. Ex. 3 at 81:3–8, ECF no. 25-5 ("We do not provide equipment to the customers on the AFMS3 contract."). Mr. Jefferson does not bother to contest SAIC's contention, "properly address" this record evidence, or point to contrary evidence. Fed. R. Civ. P. 56(e). The Court thus considers these facts "undisputed for purposes of [SAIC's] motion." Fed. R. Civ. P. 56(e)(2).

This record, viewed in the light most favorable to Mr. Jefferson, does not support a False Claims Act claim. No reasonable jury could conclude that SAIC failed to "deliver, or cause to be delivered" any specific money or property to the federal government. 31 U.S.C. § 3729(a)(1)(D).

It may well be that the equipment in question was being neglected at the War Center. But even "widespread negligence and mismanagement" concerning government property is not enough to make out a claim absent indicia that the defendant "deliver[ed]" or "failed to deliver" property "to the government." *Foreman*, 19 F.4th at 122. So Mr. Jefferson cannot meet his burden to "identify" a violation of the Act that he was investigating or preventing. *Id.*

Ultimately, as he himself tells it, Mr. Jefferson's claims arise from "concerns regarding compliance with cybersecurity requirements," not any fear that SAIC was not delivering certain equipment. Jefferson Decl. ¶ 24, ECF No. 37-2. And the False Claims Act "is not 'a vehicle for punishing" mere "regulatory violations." *Kasowitz Benson Torres LLP*, 929 F.3d at 727 (quoting *Universal Health Servs.*, 579 U.S. at 194) (recognizing that courts do "not interpret the term 'property' in a way that fundamentally changes the relationship between the [False Claims Act] and garden-variety regulatory violations" (cleaned up)).

**2. Scans**

Next, Mr. Jefferson claims that he engaged in False Claims Act protected activity by complaining of "the scope of [SAIC's] ACAS scans and accuracy of its corresponding reporting." Pl.'s Opp'n 4. This time, Mr. Jefferson does not even bother to identify a provision of the False Claims Act that SAIC was allegedly violating or that he was investigating. *See id.* at 4–5. He makes no attempt to explain how the relevant scans or reporting have any connection to any money or property that SAIC "has possession, custody, or control of" and that would be delivered to the federal government. 31 U.S.C. § 3729(a)(1)(D). Nor does he suggest that these scans or reporting were related to any "obligation to pay or transmit money or property to the Government." *Hoyte v. Am. Nat. Red Cross*, 518 F.3d 61, 69 (D.C. Cir. 2008) (cleaned up) (discussing the reverse false claims act standard). On this record, no reasonable jury could find for Mr. Jefferson.

***

For these reasons, the Court grants summary judgment to SAIC on Mr. Jefferson's False Claims Act retaliation claim.

**B. Defense Contractor Whistleblower Protection Act**

The Defense Contractor Whistleblower Protection Act borrows its "legal burdens of proof" from the Whistleblowers Protection Act, 5 U.S.C. § 1221(e), which protects federal government employees. 10 U.S.C. § 4701(c)(7); *see United States ex rel. Cody v. ManTech Int'l, Corp.*, 746 F. App'x 166, 178 (4th Cir. 2018). Thus, to make out a retaliation claim under the statute, a plaintiff must show that "(1) he engaged in protected activity . . ., (2) the [relevant] decision maker knew he engaged in protected activity, and (3) his protected activity was a contributing factor in the adverse employment action taken against him, unless (4) [the defendant] shows by clear and convincing evidence that it would have taken the employment action despite [the plaintiff's] protected activity." *Miller v. Inst. for Def. Analyses*, 795 F. App'x 590, 597 (10th Cir. 2019) (citation omitted); *see also Marcato v. USAID*, 11 F.4th 781, 788 (D.C. Cir. 2021) (discussing standard under § 1221(e)); *Oliva v. Dep't of Veterans Affs.*, 176 F.4th 650, 656 (Fed. Cir. 2026) (same). The Court addresses each prong in turn, ultimately finding that each raises factual questions incapable of resolution at this stage.

**1. Protected Activity**

Starting with protected activity, "[a]n employee makes a protected disclosure 'if a disinterested observer with knowledge of the essential facts known to and readily ascertainable by the employee [could] reasonably conclude that the actions [at issue] evidence gross mismanagement, a gross waste of funds, an abuse of authority, or a violation of any law, rule, or regulation.'" *Busselman v. Batelle Mem'l Inst.*, No. 18-cv-5109, 2019 WL 7763845 at *5 (E.D.

Wash. Nov. 15, 2019) (quoting *Coons v. Sec'y of U.S. Dep't of Treasury*, 383 F.3d 879, 890 (9th Cir. 2004)). A plaintiff "'need not prove that the condition disclosed actually established one or more of the listed categories of wrongdoing,' but instead 'must show that the matter disclosed was one which a reasonable person in h[is] position would believe evidence one of the situations specified.'" *Id.* at *5 (quoting *Drake v. Agency for Int'l Dec.*, 543 F.3d 1377, 1382 (Fed. Cir. 2008)) (emphasis omitted).

On this record, a jury could find that Mr. Jefferson made protected disclosures. He repeatedly warned that the failure to follow the Defense Information Systems Agency's best practices would result in "fraud, waste, and abuse." Pl. Ex. V. And he made various complaints that ISSM Gjellstad, Commander Powell, and SAIC management were engaged in retaliation and efforts to circumvent DoD policy. Pl. Ex. EE. Indeed, SAIC itself seemed to presume that some sort of "gentlemen's agreement" was reached during a meeting with Mr. Jefferson to resolve his concerns and complaints. Pl. Ex. V. And an "abuse of authority" under the Act is "[a]n arbitrary and capricious exercise of authority that is inconsistent with the mission of the Department of Defense or the successful performance of a Department contract or grant." 10 USC § 4701(g)(6). This is enough for a jury to find that Mr. Jefferson reasonably believed that there was a covered wrongdoing at SAIC.

SAIC argues the contrary, contending that Mr. Jefferson "did not have an objectively reasonable belief that there was a violation of any law, rule, or regulation, gross mismanagement, or that he was engaging in any other protected activity." Def.'s Mot. Mem. 21, ECF No. 25-1. But a plaintiff "need not prove that the condition disclosed actually established one or more of the listed categories of wrongdoing." *Busselman*, 2019 WL 7763845 at *5 (cleaned up). And in any event, in seeking summary judgment, SAIC relies on the expert testimony of a cybersecurity

professional that Mr. Jefferson's concerns were unreasonable. Def.'s Reply 1–10. But Mr. Jefferson, who has an extensive background in cybersecurity himself, attests otherwise in a declaration. And because the testimony of SAIC's expert and Mr. Jefferson "both . . . may be deemed admissible" to show whether Mr. Jefferson acted as a reasonable person under the relevant guidance, it is "for a jury to assess which is more credible on the ultimate issue." *Grotheer & Co. v. Safe Haven Enters.*, No. 10-cv-2058, 2014 WL 12662646, at *5 (D.D.C. Apr. 29, 2014) (denying summary judgment based on expert testimony alone). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ruling on a motion for summary judgment." *Anderson*, 477 U.S. at 255. Ultimately, both Parties fail to recognize that "it usually is for the jury to decide whether the conduct in question meets the reasonable man standard." *Shifrin v. Wilson*, 412 F. Supp. 1282, 1296 (D.D.C. 1976) (quoting 10 Wright and Miller, *Federal Practice and Procedure* § 2730, at 572–73 (1973)). The Court sees no reason to depart from that well established principle here. It thus denies summary judgment to both Parties on this question.

**2. Knowing State of Mind**

Next, a plaintiff must establish that the relevant decision maker knew that he engaged in protected activity. The Court may not grant summary judgment on this question either. Mr. Jefferson asks this Court to find that "SAIC decisionmakers had knowledge of [his] protected disclosures before taking adverse action." Pl.'s Mot. Mem. 17, ECF No. 27-1. But given that the Court leaves it to the jury to decide whether there are protected disclosures in the first place, it cannot rule on whether SAIC knew or did not know about any protected disclosures. Regardless, "a determination of someone's state of mind usually entails the drawing of factual inferences as to which reasonable men might differ—a function traditionally left to the jury—summary judgment

often will be an inappropriate means of resolving an issue of this character." *Shifrin*, 412 F. Supp. at 1295 (quoting 10 Wright and Miller, *Federal Practice and Procedure* § 2730, at 583–84).

**3. Causation**

Turning next to causation, the standard under the Defense Contractor Whistleblower Protection Act bears some familiarity to the *McDonnell-Douglas* framework used in Title VII cases. But the Act establishes its own burden shifting framework drawn from federal employee whistleblower protection law. *See Miller*, 795 F. App'x at 597. Under the statute, a plaintiff has a "*prima facie* burden . . . to show that his or her whistle-blowing *was a contributing factor* in the retaliatory actions taken against him or her." *Rouse v. Farmers State Bank of Jewell*, 866 F. Supp. 1191, 1207 (N.D. Iowa 1994) (citing 5 U.S.C. § 1221(e)(1)). This test "is broad and forgiving," *Lockheed Martin Corp. v. Dep't of Labor*, 717 F.3d 1121, 1136 (10th Cir. 2013), and is "specifically intended to overrule existing case law, which requires a whistleblower to prove that his protected conduct was a 'significant', 'motivating', 'substantial', or 'predominant' factor in a personnel action in order to overturn that action," *Marano v. Dep't of Justice*, 2 F.3d 1137, 1140 (Fed. Cir. 1993) (citation omitted). "A contributing factor is any factor, which alone or in combination with other factors, tends to affect in any way the outcome of the decision." *Miller*, 795 F. App'x at 597 (quoting *Feldman v. Law Enf't Assocs. Corp.*, 752 F.3d 339, 348 (4th Cir. 2014)). "If the [plaintiff] meets this burden, then the employer must demonstrate by clear and convincing evidence that it would have taken the same personnel action in the absence of such disclosure." *Rouse*, 866 F. Supp. at 1207 (citing 5 U.S.C. § 1221(e)(2)).

SAIC argues that Mr. Jefferson cannot meet the contributing factor causation standard, and that even if he could, SAIC has demonstrated that it would have fired him regardless. Def.'s Mot. Mem. 27–28. To put it mildly, SAIC's argument is a stretch. There is substantial record evidence

from which a jury could determine that Mr. Jefferson's claimed protected activity was a contributing factor or even a but-for cause for his termination and the other acts that preceded it. For instance, there is substantial "temporal proximity between [Mr. Jefferson's claimed] protected activity and the adverse employment actions" that he complains of. *Miller*, 795 F. App'x at 597. Mr. Jefferson began receiving warning letters and purported threats to end telework within weeks of his March 23, 2022, email raising concerns that SAIC was not following the Defense Information Systems Agency's best practices or policies. PJSF ¶¶ 29–33 JSUF¶¶ 51–59. And his compelled leave, revocation of telework, and termination followed other emails raising concerns about retaliation. *See supra* Factual Background. This temporal proximity is particularly indicative of causation because SAIC promoted Mr. Jefferson shortly before his claimed protected activity. JSUF ¶ 50. Such a change in temperament after a plaintiff engages in protected activity can be strong evidence of causation. *See Harris v. CNN Am., Inc. / Warner Media Inc.*, No. 23-cv-3526, 2026 WL 491447, at *11 (D.D.C. Feb. 23, 2026); *Jackson v. Genesee Cnty. Rd. Comm'n*, 999 F.3d 333, 352 (6th Cir. 2021).

Furthermore, a reasonable jury could conclude that Mr. Johnson was "lying about the underlying facts of [his] decision" to deny telework based on his earlier internal communications suggesting that he thought that Mr. Jefferson should be reprimanded for his email disclosures. *Allen v. Johnson*, 795 F.3d 34, 40 (D.C. Cir. 2015) (cleaned up); Exs. V, EE. And the "changes and inconsistencies" in the reasons for Mr. Jefferson's termination—shifting between performance and ethical timesheet concerns—may also serve as evidence of causation for retaliation purposes. *Id.* But any "[c]redibility determinations, . . . weighing of the evidence, and . . . drawing of legitimate inferences from the[se] facts are jury functions, not those of a judge at summary judgment." *Barnett v. PA Consulting Grp.*, 715 F.3d 354, 358 (D.C. Cir. 2013) (quoting *Pardo-*

*Kronemann v. Donovan*, 601 F.3d 599, 604 (D.C. Cir. 2010)). Accordingly, the Court may not decide the question of causation on this record.

Finally, Mr. Jefferson contends that SAIC took several adverse actions in response to his claimed protected activity, including prohibiting telework and revoking his telework privileges, demoting him, issuing two written warnings, placing him on leave without pay, terminating him, and making negative statements regarding his credibility to a security clearance investigator. Pl.'s Mot. Mem. 19–22. And he asks this Court to rule at summary judgment that the revocation of his telework, demotion, and termination were adverse actions under the statute. *Id.* The Court notes that the Parties dispute whether Mr. Jefferson voluntarily chose to telework and whether he was demoted. PJSF ¶¶ 37, 40. So those are issues for a jury to decide. Undoubtedly though, Mr. Jefferson's termination would be an adverse action if he shows causation. *See Cejka v. Vectrus Sys. Corp.*, 292 F. Supp. 3d 1175, 1193 (D. Colo. 2018). Accordingly, he is not entitled to summary judgment in this case, but the Court notes its agreement with Mr. Jefferson on that legal question.

***

Because there are factual issues to be resolved at each step, the Court denies summary judgment to both Parties on the Defense Contractor Whistleblower Protection Act claim.

## CONCLUSION

For the foregoing reasons, the Court grants in part and denies in part the Defendant's Motion for Summary Judgment, ECF No. 25, and denies the Plaintiff's Partial Motion for Summary Judgment, ECF No. 27.

A separate order will issue.

SPARKLE L. SOOKNANAN
United States District Judge

Date: August 26, 2026